THE STATE OF WASHINGTON, *Respondent*, v. CHARLES TYSON
VIDAL, *Appellant*.

*Edmund E. Lozier*, for appellant (appointed counsel for appeal).

*Ronald L. Hendry, Prosecuting Attorney, Joseph D. Mladinov, Special Counsel*, and *Eugene G. Olson, Chief Criminal Deputy*, for respondent.

WRIGHT, J.—Defendant appeals from a conviction of the first-degree murder of a 13-year-old Tacoma, Washington boy on June 16, 1970.

The arrest of the defendant occurred in the following manner. At approximately 8:12 p.m. on July 15, 1970, the chief of police of Osburn, Idaho received a call from the sheriff's office in Wallace, Idaho informing him that there was a man at the Osburn fire station who wanted to talk to him. According to this police officer, the defendant told him that he wanted to confess to a murder in Tacoma, Washington. The police officer testified that he informed the defendant of his constitutional rights and then transported him to the office of the sheriff of Shoshone County, Idaho. The record shows that upon arrival at the sheriff's office, the police chief told the sheriff's jailer that the defendant wanted to confess to a murder in Tacoma, Washington. Subsequently, the defendant stated where the victim's body was located. Immediately thereafter, the jailer read him his constitutional rights from a printed card, and the defendant was placed in jail. Since the defendant was indigent, an Idaho attorney was appointed.

Based upon a teletype message leading to the location of the victim's body, a warrant was issued in Pierce County, Washington charging the defendant with second-degree murder; and a fugitive warrant was issued in Shoshone County, Idaho and the defendant was placed in custody in Wallace, Idaho.

After consulting with his Idaho appointed attorney, the defendant waived extradition and was returned via automobile to Tacoma, Washington by two Tacoma city police detectives. During this trip, defendant confessed to the murder of the 13-year-old Tacoma boy and told the officers the location of the body. Upon arrival in Tacoma, a written confession was prepared by a stenographer and signed by the defendant.

Counsel was appointed for the defendant after a determination that he was indigent, and he was arraigned in superior court, Pierce County, on a charge of first-degree murder.

Evidence brought out at the hearings to determine defendant's competency and the admissibility of his confession, as well as evidence brought out at trial, show that the defendant had been incarcerated in California institutions most of his life. On September 6, 1960, when he was about 10 years old, defendant was declared uncontrollable and sent to an institution after he had assaulted a boy with a rock. He was paroled from that institution on March 24, 1963. On May 13, 1963, defendant murdered a 7-year-old boy by stabbing him, and was placed in an institution where psychiatrists declared him extremely dangerous and criminally insane, recommending that he should never be paroled. On December 23, 1969, after requesting his own release, and despite some 23 psychiatric reports classifying him as criminally insane and extremely dangerous, the defendant was released. Within 6 months after his release, the defendant was involved in the killing in Tacoma, Washington, and 2 weeks later in Wallace, Idaho he killed yet another boy.

The trial court found the defendant competent to assist his counsel in his defense and further found that his confession was freely and voluntarily given and could be used as evidence against him. After his trial, the jury found the defendant sane and further found the defendant guilty of first-degree murder, with the special finding that the death

sentence be imposed. Defendant appeals from this conviction of first-degree murder.

The first issue raised on appeal is whether the trial court erred in finding that the defendant's confession was freely and voluntarily given.

The defendant contends that his transportation from Idaho to Washington was a custodial interrogation with the purpose of eliciting information regarding the crime. He further alleges that he did not have free access to a telephone and that his attorney was not present at all times during interrogation. And, citing *Blackburn v. Alabama*, 361 U.S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960) and *Culombe v. Connecticut*, 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860 (1961), the defendant states that the confession of a defendant suffering from a mental disease or defect which impairs his ability to make a free or rational decision, or makes him inordinately sensitive to police interrogation, is inadmissible because of his infirmity.

The record is replete with evidence that the defendant was repeatedly advised of his constitutional rights and was represented by counsel. He was told of his constitutional rights by the chief of police of Osburn, Idaho. Again he was advised of his rights by the sheriff's office in Wallace, Idaho. A most distinguished attorney, a past president of the Idaho State Bar Association, was appointed legal counsel for the defendant prior to July 20, 1970. This attorney refused to give permission to the Tacoma detectives to question the defendant. Additionally, he made a careful check of all the circumstances before allowing the defendant to waive extradition. Also, the prosecuting attorney of Shoshone County, Idaho forbade the questioning of defendant by Idaho authorities and by the Tacoma officers. The first thing that the Tacoma detectives did when they saw the defendant in Idaho was to read the defendant the Tacoma Police Department Advisement of Rights Form. In fact, the defendant was asked to read the first line out loud and sign the form—which defendant did. The Tacoma officers testified that during the trip from Idaho to Wash-

ington the defendant repeatedly asked them if what he said could be used against him and that they advised him that anything he said could be used against him in a court of law. Counsel was appointed for the defendant in Washington.

Where a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in-custody statement. *State v. Rowe*, 77 Wn.2d 955, 468 P.2d 1000 (1970). Further, there is no constitutional protection prohibiting the prosecution or its agents from communicating directly with an arrested person represented by counsel. *State v. Nicholson*, 77 Wn.2d 415, 463 P.2d 633 (1969). The right to have retained counsel present at interrogations and to remain silent can be waived without an express or affirmative waiver; although there is a heavy burden on the state to show that the person's statement was voluntary. *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968). The state has met this burden.

As to the second phase of this first issue raised on appeal, pretrial proceedings, conducted in accordance with *Pate v. Robinson*, 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836 (1966), determined defendant's competency to stand trial. The record supports the trial court's finding of competency and it will not be disturbed on appeal. *See Lindbrook Constr., Inc. v. Mukilteo School Dist. 6*, 76 Wn.2d 539, 458 P.2d 1 (1969); *Noah v. Montford*, 77 Wn.2d 459, 463 P.2d 129 (1969); *Ocean Spray Cranberries, Inc. v. Doyle*, 81 Wn.2d 146, 500 P.2d 79 (1972).

The second issue raised on appeal is whether the trial court erred in excluding three prospective jurors without an intensive, searching inquiry into their response that they could not inflict the death penalty in a proper case.

The defendant contends that the requirements of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968) were not met in the instant case.

As discussed below, the death penalty under the

existing statutes of this state has been abolished. Therefore, this issue is moot and this court will not decide questions which are moot or academic. *Grays Harbor Paper Co. v. Grays Harbor County*, 74 Wn.2d 70, 442 P.2d 967 (1968).

The third issue raised on appeal is whether the trial court erred in giving an instruction on "irresistible impulse".

■ The defendant asserts that the inclusion of an instruction on irresistible impulse together with a previous instruction defining this state's test for insanity added only confusion to the jury and injected into the trial something which had not been discussed before the jury.

The jury in this case heard that the defendant "has a very fast temper"; had impulsively murdered a 7-year-old boy when he was 13; had a strong urge to harm 7-year-old boys; had been diagnosed as an obsessive, compulsive personality; and that at times he is almost like a robot, etc. The psychiatrist called for the defendant said that when he saw the Tacoma boy, it was literally like pushing a button and that the emotional machinery existing in his mind was carried out in an almost automatic way and he was almost like a robot. This same psychiatrist described the defendant's act of killing the Idaho boy by saying that the defendant's impulses ran away with him and he immediately went on this bizarre act.

No error was committed by the trial court in giving an instruction on irresistible impulse for, in this regard, the facts of the present case are quite similar to those of *State v. Cogswell*, 54 Wn.2d 240, 339 P.2d 465 (1959) which held that an instruction that irresistible impulse is not insanity and therefore not a defense was justified where a psychologist and a psychiatrist, testifying for the defendant, had discussed his "control system" and his "ability to control".

■ The fourth issue raised on appeal is whether the trial court erred in admitting two colored photographs of the body of the victim in a decomposed state.

The defendant contends the photographs were inflamma-

tory and prejudicial. One of the two colored photographs in question shows the body of the victim as it was found at the scene of the crime. The other shows the body as it was placed on the coroner's winding sheet for transportation from the scene.

*State v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967) held that color photographs showing the victim's body are admissible in a prosecution for murder.

Competent evidence is not prejudicial just because it is gruesome. *State v. Farley,* 48 Wn.2d 11, 290 P.2d 987 (1955); *State v. Griffith,* 52 Wn.2d 721, 328 P.2d 897 (1958).

Moreover, it seems unlikely that these two photographs would inflame the jury so as to prejudice its members concerning the defendant's guilt or innocence, especially in view of the testimony of a psychiatrist called as a defense witness. This witness went into minute detail concerning descriptions related to him by the defendant of the murder of the Tacoma boy and that of the Idaho boy.

The admission or rejection of photographs lies largely within the sound discretion of the trial court, and in the absence of abuse of this discretion, the trial court's ruling will not be disturbed on appeal. *Mason v. Bon Marche Corp.,* 64 Wn.2d 177, 390 P.2d 997 (1964).

The fifth issue raised on appeal is whether the death penalty violates the United States Constitution and the Washington State Constitution.

The recent case of *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), has the effect of preventing the imposition of the death penalty under the existing statutes of the State of Washington. *State v. Baker,* 81 Wn.2d 281, 501 P.2d 284 (1972).

Accordingly, this case is hereby remanded for resentencing in light of *Furman v. Georgia, supra.*

HALE, C.J., FINLEY, ROSELLINI, HUNTER, HAMILTON, and STAFFORD, JJ., concur.

UTTER, J. (dissenting)—Charles T. Vidal has now brutally murdered three defenseless children—one in Califor-

nia, one in Idaho, and one in this state. At no time in the future should he have the opportunity to harm others. Anyone reading the record of his conduct could come to no other conclusion. Vidal's permanent confinement eventually will be assured either through this proceeding, other proceedings in our state, or by proceedings in the other states where he has committed crimes. Having once recognized and said this, however, the question must be asked whether it is important that the process by which this state determines guilt and the degree of guilt should be consistent with our established standards of justice or whether the enormity of this defendant's acts justifies a less strict scrutiny.

Our standards should be the same for all regardless of the offense or the nature of the conduct. If we allow a process resulting in Vidal's confinement to occur without adhering to our established rules for admission of evidence, we make his confinement something less than one obtained in the tradition of our law, we substitute an understandable emotional cry of outrage for reason, and establish precedents for use in other cases where guilt may not be so clear or the need for confinement so urgent.

Vidal's confession may be inadmissible because I am unable to say whether the state has met its heavy burden of demonstrating a lawful waiver of rights by the defendant. The majority fails to distinguish between a waiver of constitutional rights and the voluntariness of a confession. It also incorrectly deems "good faith" behavior by the authorities permissible, though such behavior may be coercive as to the defendant.

As we recognized in *State v. Davis*, 73 Wn.2d 271, 284-85, 438 P.2d 185 (1968):

> The Supreme Court in *Miranda* [384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602] was unequivocal in holding that "a *heavy burden* rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (Italics ours.)
> . . . The court was equally clear in expressing its

reasons for placing the burden of proof on the prosecution. "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available *corroborated* evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." (Italics ours.)

This heavy burden is especially significant and justified in this case which involved a confession in the *isolated circumstances* of an approximately 8-hour, 400-mile patrol car drive from Wallace, Idaho to Tacoma, Washington. Such a situation involving "incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights." *Miranda v. Arizona,* 384 U.S. 436, 476, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). *See also State v. Davis, supra* at 287.

The failure of the majority opinion to present or analyze any evidence relating to this period of the defendant's transfer from Idaho to Washington undermines its conclusion that "the state has met this burden." The majority opinion does highlight the appointment of counsel for defendant in Idaho and the significant protections the appointed counsel provided for the defendant before waiving extradition, as well as the appointment of counsel in Washington and the vigorous defense asserted at this stage. However, the opinion fails to comment on the crucial interim period at question where no counsel was present and the confession was forthcoming.

The record reveals this long and isolated drive involved two Tacoma detectives and the defendant. There is no dispute that the defendant was in custody and that the questioning which occurred during the transfer trip was interrogation. At issue is the lawfulness of the defendant's waiver of his rights.

The detectives and defendant departed Wallace, Idaho at approximately 3 p.m. and made brief stops at Terror Gulch (for defendant's personal belongings), Spokane (for gas and a coke), and George (for a meal). During this approxi-

mately 3-hour, 150-mile portion of the trip, there was no conversation regarding the alleged crime. After returning to the car following the meal, a detective testified:

[W]e started talking to him about the homicide. He denied that he had committed the homicide, and he said he had seen the body, but he hadn't killed him.

Conversation continued about the body and soon the defendant inquired what the penalties would be for this crime. In response, the detectives did not tell the defendant that he could be charged with first-degree murder but instead indicated "I told him at that time . . . it was second degree murder, it was the warrant we had." With this knowledge, the defendant continued to talk about the crime and responded to quizzing by the detectives.

After the conversation about possible penalties, the defendant inquired if anything he said would be used against him and the detectives testified "we told him, anything you tell us can be used against you in a court of law, *for or against* you." (Italics mine.) As to the quizzing which transpired after the meal at George, the detectives concede their intention was to elicit a confession to the crime from the defendant.

The majority concludes the above evidence meets the heavy burdens of *Miranda* and *Davis,* but reaches its conclusion without presenting any of the pertinent facts of the transfer trip or without demonstrating how the state has met its burden. The record itself fails to show whether the detective's statement to Vidal that he was only charged with second-degree murder had the effect of encouraging him to confess or whether he would have confessed regardless of the charge. It is possible to infer from the record that had Vidal realized he could later be charged with first-degree murder he would not have confessed at all. Because of the lack of information in the record concerning these facts, I am unable to determine whether or not the state met its heavy burden to show a voluntary and intelligent waiver of Vidal's rights.

.The majority fails to distinguish between Vidal's waiver of rights and the voluntariness of his confession. In this case, the majority answers the basic question of whether the suspect waived his rights in the affirmative, not by evaluating the circumstances alleged to have compelled a waiver but by summarily determining the confession was voluntary.

When there is interrogation of an in-custody suspect which results in incriminating statements, such statements shall only be admissible at trial if the suspect waived his or her rights to remain silent and to have the assistance of counsel, and then voluntarily confessed. *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). The suspect may waive the right to remain silent and to have the assistance of counsel, "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona, supra* at 444. It is to this waiver that the "*Miranda* rights" are critical. When such a waiver occurs, then the confession may be forthcoming and admissible if it is the product of a free and rational choice.

We recognized that waiver of rights and voluntariness of confessions can be two separate considerations in *State v. Blanchey*, 75 Wn.2d 926, 454 P.2d 841 (1969). In *Blanchey*, at page 934, we held that when the defendant did not fully realize his constitutional rights, "then he did not make a knowing decision to *waive his rights* regardless of the '*voluntariness*' of his statements." (Italics mine.) The majority may be correct that the defendant voluntarily confessed, but under *Miranda* and *Blanchey* this conclusion is irrelevant to the question of whether preceding the statement a waiver of rights was validly made.

Any evidence that the defendant relinquished his rights because of incomplete information as to the possibility of an increased charge may result in a finding of an unlawful waiver of rights, thereby forbidding the admission of the confession into evidence, be it voluntarily or involuntarily given.

The majority fails to recognize that the standards in judging the validity of a waiver of constitutional rights are concerned with the mental processes of the defendant and not with those of the interrogating authorities. This concern is dictated by *Miranda*'s awareness of the "compelling atmosphere" of custodial interrogations despite any "bad conduct" by interrogators. In addition, this concern emanates from the pre-*Miranda* due process "totality of circumstances" test of the voluntariness doctrine which encompassed *all* practices likely to exert impermissible pressure upon the individual. *See Miranda v. Arizona, supra* at 464. The character of the compulsion is therefore irrelevant if the compelling influence is shown. *See also State v. Creach,* 77 Wn.2d 194, 197, 461 P.2d 329 (1969).

This concern for the individual suspect's history, personality and condition at time of interrogation has long standing in our jurisprudence and predates *Miranda. Miranda v. Arizona, supra* at 457; *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A.L.R.3d 1205 (1964) (sickness); *Townsend v. Sain,* 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745 (1963) (drugged); *Culombe v. Connecticut,* 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860 (1961) (lack of schooling and mental capacity); *Spano v. New York,* 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202 (1959) (emotional problems); *Crooker v. California,* 357 U.S. 433, 2 L. Ed. 2d 1448, 78 S. Ct. 1287 (1958) (legal education); *Fikes v. Alabama,* 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281 (1957) (feeblemindedness). *See generally Developments in the Law—Confessions,* 79 Harv. L. Rev. 935, 961-83 (1966).

It is paradoxical to see the majority finding apparent favor with police conduct which might in fact mislead the defendant under the stricter waiver standards of *Miranda* and subsequent cases, when such misleading and often innocent behavior was treated unfavorably under the earlier voluntary confession doctrine.

In *Townsend,* for example, the suspect was interrogated and confessed while under the influence of a medication

containing a drug having the effect of a "truth serum." In finding the confession inadmissible, the court held the facts that the medication was administered to the suspect solely for innocent purposes (to alleviate distress from heroin withdrawal) and that the interrogators were unaware of the "truth serum" effect of the medication were of no significance. The court concluded "[a]ny questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible." *Townsend v. Sain, supra* at 308. Thus, the evidence offered in *Townsend* to show no "improper purpose" on the part of the authorities was deemed irrelevant. *See Blackburn v. Alabama,* 361 U.S. 199, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960).

It is the *in fact* compulsion that is critical in the determination of the validity of a waiver of rights and the voluntariness of a confession. The question before us is whether the information supplied to the suspect invalidated the waiver of rights. If we can conclude that the *in fact* incomplete information provided by the police to the suspect would tend to compel a confession, the resulting confession must be suppressed.

The majority seems to conclude that there can be no possible harm to the defendant because of the *then* true statement that he was charged with second-degree murder. Supposedly, the court would find the confession questionable and possibly suppressable had the police information been untrue at the time it was offered to the suspect. Yet, does this change in conclusion make any constitutional sense if we are to look to the perceptions and judgment of the suspect? It is the suspect's decisions that we are to judge, not the character of the interrogator's decision making. Under either factual circumstance—whether the information supplied was true or untrue, or whether the detectives acted in "good faith" or "bad"—the suspect's perceptions, mental processes, and resulting waiver of rights and confession would be identical. Yet the majority would apparently come to varying conclusions. The majority's con-

clusion seemingly rests upon the motives of the interrogators and fails to evaluate, regardless of motives, whether the conduct in question compelled a waiver of rights. It is this critical point the majority misses.

The factual issue we cannot pass upon is whether Vidal made a knowing and intelligent waiver on the basis of incomplete information provided, or whether this incompleteness was in fact no barrier to his waiver. I am also unclear about whether the trial court believed the state met its heavy burden of showing a voluntary confession due to the particular factors of the isolated nature of the interrogation, the length of interrogation, and the defendant's lack of mental capacity. Under *Miranda* and *Davis*, the state has a heavy burden, due to the isolated nature of the interrogation in the car, to show that Vidal knowingly and intelligently waived his rights against self-incrimination and to counsel.

I would remand this case for a hearing on these specific issues.

Petition for rehearing denied May 9, 1973.